NOT DESIGNATED FOR PUBLICATION

No. 116,448

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH A. ARELLANO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Finney District Court; WENDEL W. WURST, judge. Opinion filed March 16, 2018.
Affirmed.

*William A. Wright*, of Garden City, for appellant.

*Brian R. Sherwood*, assistant county attorney, *Susan Lynn Hillier Richmeier*, county attorney, and
*Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., GREEN, J., and HEBERT, S.J.

PER CURIAM:  Joseph Arellano was pulled over after a Kansas state trooper
observed him commit two driving infractions. After displaying signs of intoxication,
Arellano failed two field sobriety tests. Arellano told the officer that he had "been out"
and had "had a couple." At the station, the officer provided Arellano with informed
consent warnings, and Arellano refused to take the breath test. Eventually, Arellano was
charged with driving under the influence, refusal of a breath test (as a traffic infraction),
and two counts of improper turns. The district court denied Arellano's motion to suppress

1

evidence and his motion in limine regarding evidence of his refusal to take a breath test. A jury convicted Arellano of driving under the influence of alcohol or drugs, refusal of the breath test, and one count of improper turn. On appeal, Arellano argues that K.S.A. 2014 Supp. 8-1001(n), the provision in Kansas' implied consent law that allows refusal evidence to be admitted at trial, is unconstitutional. For reasons set forth below, we reject this argument. Accordingly, we affirm.

On August 30, 2014, Kansas State Trooper Dillon Barnes observed a Chevy Blazer, driven by Joe Arellano, commit two driving infractions. When Trooper Barnes stopped Arellano and walked up to his vehicle, he noticed the Blazer was about two feet from the curb. When Barnes asked for Arellano's driver's license, he saw that his eyes were bloodshot, watery, and glazed over. When he asked Arellano whether he had been drinking, Arellano told Barnes that he had "been out" and that "he had a couple."

When Barnes had Arellano move to his patrol vehicle so he could run his driver's license, he noticed an alcoholic odor coming from Arellano.

Barnes conducted two field sobriety tests with Arellano. During the first field test, the walk-and-turn test, Barnes observed Arellano exhibit six of the eight indicators of impairment: beginning the test before the instructions were completed, stopping while walking during the test, not touching heel to toe while walking, stepping off line, improperly turning on the test, and failing to do the correct amount of steps required. The second field test was the one-leg-stand test. Barnes observed Arellano exhibit three of the four indicators of impairment: swaying while attempting to balance, using his arms to maintain balance, and putting his foot down before the required 30 seconds. In addition to these two field sobriety tests, Barnes noticed Arellano leaning on his patrol vehicle to help maintain his balance.

2

After Barnes conducted the field sobriety tests, he brought Arellano back to his patrol vehicle to administer the preliminary breath test (PBT). Barnes informed Arellano what would happen if he refused to take the PBT, but Arellano continued to ask what would happen if he refused. Eventually, Barnes told Arellano that he would be charged for refusing to take the PBT. Arellano avoided Barnes' questions and did not agree to taking the PBT.

Barnes arrested Arellano for driving under the influence of alcohol and took him to the Finney County Law Enforcement Center to take an Intoxilyzer 8000 breath test. At the law enforcement center, Barnes read the DC-70 form to Arellano as required by law. The DC-70 form is an implied consent form from the Department of Revenue. One portion of the form lists the various consequences that could occur, depending on the present facts and how many times the individual has been arrested or convicted for this offense before. After reading the informed consent form, Barnes requested Arellano take the breath test, and Arellano again asked what would happen if he refused the breath test and what would happen to his license. Arellano seemed most concerned with what would happen with his driver's license, so Barnes again read the parts of the DC-27 form that pertained to consequences regarding drivers' licenses. When Barnes got to one portion of the form which reads "if paragraph 4 of the certification on the reverse side indicates you failed a test and the test result was .15 or above, the following action will be taken on your driving privileges." Arellano interrupted Barnes and said, "I'll be over. I'm not going to lie to you."

As Barnes again reviewed Arellano's options, Arellano continued asking questions but never responded to whether he would take the test. Eventually, Barnes told Arellano he was going to consider it a refusal, and Arellano said, "Okay."

Arellano was charged with driving under the influence, refusal of a breath test (a traffic infraction under K.S.A. 2014 Supp. 8-1012), and two counts of improper turns.

3

Arellano entered a plea of not guilty. The court heard several pretrial motions, including Arellano's motion to suppress evidence and "motion in limine test refusal." The district court denied Arellano's motion in limine regarding his test refusal. The court also denied Arellano's motion to suppress, which cited K.S.A. 2014 Supp. 8-1001(n) in its determination that evidence of Arellano's refusal to submit to alcohol testing was admissible in his DUI trial. In ruling on Arellano's test refusal, the trial court stated:

"Here, the Defendant was accurately advised of one of the consequences should he refuse to submit to alcohol content testing (admissibility of evidence of such refusal) and Defendant was able to make an informed decision how to proceed.

"Because of the State's compelling interests in obtaining reliable alcohol content testing in appropriate circumstances; because K.S.A. [2014 Supp.] 8-1001(n) does not involve criminal sanctions for withdrawing implied consent nor admissibility of test results involuntarily consented to; and because the Defendant was accurately advised of the admissibility of evidence at trial of a refusal to submit to alcohol content testing; evidence of Defendant's refusal to submit to alcohol testing will be admissible at trial."

At trial, the State introduced evidence that Arellano was stopped by law enforcement after observation of a driving error. When asked by the officer, Arellano admitted to consuming alcohol and the officer testified that he smelled a strong odor of alcohol and that Arellano's eyes were watery and bloodshot. The officer also testified to the intoxication indicators observed during the field sobriety tests. The officer testified that he requested Arellano take a PBT but that he eventually refused. He testified that he took Arellano to the police station where they discussed his options. Without specific answers coming from Arellano, the officer informed Arellano he was going to be charged with refusal to take the Intoxilyzer and Arellano replied okay.

The district court noted Arellano's statement made in the patrol car and statements made while the implied consent was being read were admissible at trial. The court also stated that the evidence regarding Arellano's test refusal would also be admissible at trial. Defense counsel stated that he wanted to renew his motion to not allow the Intoxilyzer refusal, but this was done before the jury was sworn in and impaneled. Defense counsel did not object during the trial when the evidence of Arellano's test refusal was admitted or when his statements to Barnes were admitted.

A six-person jury convicted Arellano of driving under the influence of alcohol or drugs, refusal of the PBT, and one count of improper turn. The court sentenced Arellano and he filed a timely notice of appeal.

*Did the Trial Court Err in Allowing the State to Introduce Evidence of Arellano's Refusal to Take a Breath Test in His DUI Case?*

*Standard of Review*

Arellano does not specify which standard of review he believes applies to his claims on appeal, which makes it difficult to clearly understand his argument. He begins the argument section of his brief by saying that "[t]he issue presented on appeal is whether the district court should have granted the defendant's motion to exclude or make inadmissible evidence of the defendant's refusal of chemical testing pursuant to K.S.A. [2014 Supp.] 8-1001(n)." Nevertheless, he does not mention the court's denial of his motion again. Instead, he argues that Kansas' implied consent statute is unconstitutional and violates his Fourth and Fifth Amendment rights under the United States Constitution. Further, in his conclusion he asks this court to "prohibit the State from tendering or using that same refusal as evidence of intoxication" and argues that K.S.A. 2014 Supp. 8-1001(n) is unconstitutional.

The State analyzes this argument under a motion to suppress standard. Nevertheless, because Arellano really seems to be arguing that Kansas' implied consent statute is at least partially unconstitutional because it violates a defendant's Fourth and Fifth Amendment rights under the United States Constitution, this court should review Arellano's claims regarding the statute's constitutionality de novo.

*Preservation*

The State argues that Arellano's claims regarding his motion to suppress are not preserved through a specific and contemporaneous objection and may not be raised on appeal. The State agrees that Arellano's attorney indicated that he wanted to renew his motion not to allow the breath test refusal evidence before the jury was impaneled and sworn in. Nevertheless, the State claims that Arellano did not object during trial when the evidence of his breath test refusal was admitted.

Despite the State's claims, we will assume that Arellano preserved this issue for our consideration. For example, when the State moved to admit its exhibits into evidence, Arellano objected to the exhibit that indicated that he refused the breath test. The objection was specific and contemporaneous to the State's presentation of its exhibits into evidence.

Turning to Arellano's main argument, we note he asserts that this court should determine that the State's use of his refusal to take a breath test under K.S.A. 2014 Supp. 8-1001(n) is a violation of his Fourth and Fifth Amendment rights under the United States Constitution. Cases from both the United States Supreme Court and the Kansas Supreme Court have settled this issue, and his argument that Kansas' implied consent statute, found in K.S.A. 2016 Supp. 8-1001, is partially unconstitutional because it

6

violates a defendant's Fourth and Fifth Amendment rights under the United States Constitution is unconvincing.

*The admission of evidence of a refusal to take a breath test does not violate Arellano's Fourth Amendment rights under the United States Constitution.*

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights protect citizens from unreasonable searches and seizures. *State v. Williams*, 297 Kan. 370, 376, 300 P.3d 1072 (2013). All warrantless searches are per se unreasonable subject to a few specific exceptions. *State v. Estrada-Vital*, 302 Kan. 549, 555-56, 356 P.3d 1058 (2015). The exceptions to the warrant requirement include: "'consent; search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances; the emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses.'" *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012) (quoting *State v. Fitzgerald*, 286 Kan. 1124, 1127, 192 P.3d 171 [2008]).

Subjecting a person to a breath-alcohol test is a search for Fourth Amendment purposes. *State v. Ryce*, 303 Kan. 899, 910, 368 P.3d 342 (2016) (*Ryce I*) ("Regardless of implied consent laws, individuals have an expectation of privacy in bodily substances and fluids, and a breath test remains a search under the Fourth Amendment."), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017) (*Ryce II*); *State v. Edgar*, 296 Kan. 513, 526, 294 P.3d 251 (2013). Importantly, Arellano never performed a breath test so there was no warrantless search. Instead, Arellano's argument centers around the idea that by using evidence of his refusal at trial, he is being punished for exercising his Fourth Amendment right to refuse to consent to a warrantless search.

He compares his situation to the "chilling effect" the United States Supreme Court addressed in *United States v. Jackson*, 390 U.S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138

7

(1968). There, the defendant challenged a provision in the Federal Kidnapping Act which provided that if the defendant pled guilty under the Act, he could not face the death penalty, but if he exercised his right to plead not guilty, the jury could impose the death penalty. Because this provision created an "increased hazard" for individuals who choose to continue their case through trial, it created a "chilling effect." The United States Supreme Court held that this effect was unnecessary and, therefore, excessive compared to the goals of the Act. The Court held that Congress may not "impose a penalty in a manner that needlessly penalizes the assertion of a constitutional right." 390 U.S. at 582-83.

Arellano argues that the informed consent statute has a similar chilling effect as the statute in *Jackson* because refusing the test results is another form of punishment. Nevertheless, the purpose of the statutes is different and thus so are the effects. Kansas' informed consent statute does not have the same punishment effect as the death penalty provision in *Jackson*. The effect of the *Jackson* statute was that individuals were deterred from asserting their Fifth Amendment right to not plead guilty and from exercising their Sixth Amendment right to demand a jury trial. 390 U.S. at 582. Although by including this provision in the Act, Congress sought to mitigate the severity of defendants' punishments by imposing a more selective death penalty procedure, the chilling effect the provision had on the exercise of constitutional rights was "unnecessary and therefore excessive." 390 U.S. at 582. Instead, the Court said: "The goal of limiting the death penalty to cases in which a jury recommends it . . . can be achieved without penalizing those defendants who plead not guilty and demand jury trial." 390 U.S. at 582.

Kansas' informed consent statute, though, has not been held to unnecessarily and excessively chill a defendant's ability or willingness to exercise his or her rights. Its purpose is "to protect the health and safety of Kansas citizens by reducing the incidences of drinking and driving, alcohol-related crashes, injuries, and fatalities." *State v. Mertz*, 258 Kan. 745, 757-58, 907 P.2d 847 (1995). Further, breath tests are tools that law

enforcement may use to protect the health and safety of citizens by determining whether an arrest should be made. *State v. Chacon-Bringuez*, 28 Kan. App. 2d 625, 631, 18 P.3d 970 (2001). Kansas' implied consent laws generally have been characterized as "legal tools to enforce [states'] drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws." *Missouri v. McNeely*, 569 U.S. 141, 160-61, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013). Most states, then, permit the prosecution to use a motorist's refusal to take a breath test as evidence against him or her in a subsequent trial. 569 U.S. at 161.

*Evidence of a breath-test refusal does not implicate the Fifth Amendment privilege against self-incrimination.*

Arellano argues that Kansas' implied consent law, which allows an individual's breath- or blood-test refusal to be admissible as evidence at his or her DUI trial, violates his Fifth Amendment privilege against self-incrimination. Nevertheless, breath tests do not implicate the Fifth Amendment.

The Fifth Amendment privilege against self-incrimination applies only to communications or testimony. *State v. Haze*, 218 Kan. 60, Syl. ¶ 1, 542 P.2d 720 (1975). The United States Supreme Court has long held that a blood-alcohol test is neither communication nor testimony. *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). Therefore, the results of blood and breath tests do not implicate the Fifth Amendment privilege against self-incrimination, and cases from the United States Supreme Court and Kansas courts have confirmed this principle.

In *Dakota v. Neville*, 459 U.S. 553, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983), the Court held that admitting evidence of a defendant's refusal to submit to a blood-alcohol test does not infringe on his or her Fifth Amendment right against self-incrimination or the Due Process Clause of the Fourteenth Amendment. The Court stated that the

9

admission into evidence of a defendant's refusal to submit to a blood-alcohol test does not offend the Fifth Amendment right against self-incrimination. 459 U.S. at 554. A refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination. 459 U.S. at 564. The offer of taking the test is clearly legitimate and becomes no *less* legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice. 459 U.S. at 563.

The Court further stated it would not be fundamentally unfair in violation of due process to use a respondent's refusal to take the blood-alcohol test as evidence of guilt, even though the police failed to warn him or her that the refusal could be used against him or her at trial. Such a failure to warn was not the sort of implicit promise to forego use of evidence that would unfairly trick respondent if the evidence were later offered against him at trial." 459 U.S. at 565-66.

The United States Supreme Court extended this reasoning when it held that the defendant's remarks regarding his refusal to take a breath test were admissible and explained that the privilege against self-incrimination does not protect a suspect from being compelled by the State to produce real or physical evidence. Rather, the privilege "'protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature.' [Citation omitted.]" *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990).

Kansas courts have also held that the admission of evidence of a refusal to take a blood or breath test is not a Fifth Amendment violation. In *State v. Compton*, 233 Kan. 690, 694, 664 P.2d 1370 (1983), our Supreme Court held that admission of test refusal evidence does not offend an individual's Fifth Amendment rights.

10

"The taking or the refusal to take the test is an option provided by the legislature. Both the results of the test, if taken, or the refusal to take it, if declined, are admissible in evidence, and the admission of such evidence does not offend the Fifth Amendment privilege against self-incrimination or the right to due process." *Compton*, 233 Kan. at 694.

Additionally, this court has rejected the argument that breath test refusals are communicative statements deserving Fifth Amendment protections. *State v. Wahweotten*, 36 Kan. App. 2d 568, Syl. ¶ 4, 143 P.3d 58 (2006); *State v. Leroy*, 15 Kan. App. 2d 68, Syl. ¶ 3, 803 P.2d 577 (1990). In doing so, this court confirmed that the results or refusal of a breath test do not invoke a defendant's Fifth Amendment privilege against self-incrimination.

Arellano compares his refusal to other rights that a defendant may invoke before or during trial. He first equates his situation with a *Doyle* violation, which occurs when the State attempts to use evidence of an accused's post-*Miranda* silence at trial. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1988) (Explaining that a *Doyle* violation is when the State attempts to introduce "evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name . . . but instead invoked his or her constitutional right to remain silent."). This is not a comparable analogy, though. A *Doyle* violation occurs after an individual is told he or she has those particular rights. In this case, not only are Arellano's Fifth Amendment rights not implicated, but he was fully aware that evidence of his refusal carried evidentiary consequences.

*The doctrine of unconstitutional conditions does not apply.*

Arellano argues that the doctrine of unconstitutional conditions applies, as he was "forced to [choose] between the assertion of his Constitutional rights and a potentially

11

incriminating test which would have invaded his body or bodily fluids." This was not the case here, and the doctrine of unconstitutional conditions does not apply.

The doctrine of unconstitutional conditions occurs when an individual must give up a constitutional right to obtain a different constitutional right. *Wahweotten*, 36 Kan. App. 2d at 578-79.

Here, Arellano seems to argue that he was forced to forgo his Fifth Amendment right against self-incrimination when he chose to exercise his Fourth Amendment right to refuse a search. Nevertheless, as discussed earlier, refusal to submit to a breath test is not a communicative statement and thus is not protected by the Fifth Amendment. See *Schmerber*, 384 U.S. at 765. Because his Fifth Amendment privilege is not at issue here, he was not faced with the decision to choose between his Fifth Amendment privilege against self-incrimination and his Fourth Amendment rights when asked to take a breath test. Therefore, the doctrine of unconstitutional conditions does not apply here.

*The implied consent law Arellano challenges has been previously upheld, and evidence of a refusal to take a breath test brought under its provisions is admissible at trial.*

Arellano seems to request that this court find that the provision in Kansas' implied consent law allowing evidence of an individual's refusal of a breath test to be admissible at trial is unconstitutional. Kansas' implied consent law provides that any person who operates a vehicle in Kansas is deemed to have consented to alcohol testing. A penalty section of the statute provides that a person's refusal to submit to such testing is admissible at trial for the underlying DUI.

The parts of Kansas' implied consent statute relevant to Arellano's claim are as follows:

12

"(a) Any person who operates or attempts to operate a vehicle within this state is deemed to have given consent, subject to the provisions of this article, to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs. The testing deemed consented to herein shall include all quantitative and qualitative tests for alcohol and drugs. A person who is dead or unconscious shall be deemed not to have withdrawn the person's consent to such test or tests, which shall be administered in the manner provided by this section.

. . . .

"(n) The person's refusal shall be admissible in evidence against the person at any trial on a charge arising out of the alleged operation or attempted operation of a vehicle while under the influence of alcohol or drugs, or both. The person's refusal shall be admissible in evidence against the person at any trial on a charge arising out of the alleged violation of K.S.A. 2014 Supp. 8-1025, and amendments thereto." K.S.A. 2014 Supp. 8-1001 (a) and (n).

Arellano argues that our Supreme Court cases of *Ryce I*, 303 Kan. 899, and *State v. Nece*, 303 Kan. 888, 367 P.3d 1260 (2016) (*Nece I*), *aff'd on reh'g* 306 Kan. 679, 396 P.3d 709 (2017) (*Nece II*), support his contention that this court should determine that evidence of his refusal of a breath test should be inadmissible at trial. Nevertheless, neither of these cases supports his claim.

In *Ryce I*, the court held that K.S.A. 2014 Supp. 8-1025, which imposed criminal penalties upon an individual who refused to submit to any test that is deemed consented to, is facially unconstitutional because it criminalizes an individual's right to withdraw consent to a warrantless search. Using a due process analysis, the court agreed that the State has a compelling interest in preventing drunk driving, but the court held that K.S.A. 2014 Supp. 8-1025 was not narrowly tailored to serve those compelling interests. 303 Kan. at 963. Although the court clearly specified that drivers have privacy interests regardless of implied consent laws, as well as the ability to withdraw consent, it also

13

acknowledged the validity of implied consent laws and that every state has a statutory scheme codifying implied consent driving laws. 303 Kan. at 910-11.

In *Nece I*, our Supreme Court reflected on its holding in *Ryce I* and held that breath tests obtained with consent, but the consent was given following an inaccurate written and oral advisory informing the defendant that he or she may be criminally charged with a separate crime of refusal of a blood or breath test, are involuntarily obtained and, thus, inadmissible. 303 Kan. at 888-89. After *Nece I*, therefore, breath tests obtained following a warning from law enforcement that his or her refusal could result in further criminal charges are inadmissible at trial. The holding in *Nece I* is not applicable to Arellano's case either. Although Arellano was given inaccurate advisories informing him that he may be criminally charged with a separate crime of refusal, he still refused to participate in a blood or breath test, meaning there is no involuntarily obtained test result at issue.

Further, Kansas courts and the United States Supreme Court have upheld laws allowing for refusal evidence to be admitted at trial, as well as implied consent laws in general.

In *Compton*, 233 Kan. at 694, our Supreme Court upheld a statute providing that a person's refusal to submit to a breath or blood test is admissible evidence at trial. In doing so, it said that "[b]oth the results of the test, if taken, or the refusal to take it, if declined, are admissible in evidence, and the admission of such does not offend the Fifth Amendment privilege against self-incrimination or the right to due process."

Recently, the United States Supreme Court has seemingly expressed its approval of implied consent laws, stating that they are good tools to prevent unsafe driving and that refusals may be used as evidence. In *McNeely*, 569 U.S. 141, the Court said that implied consent laws are "legal tools to enforce [states'] drunk-driving laws and to secure

14

BAC evidence without undertaking warrantless nonconsensual blood draws." 569 U.S. at 160-61. Additionally, the Court noted that most states use evidence of a refusal at trial:

"States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC [blood-alcohol concentration] evidence without undertaking warrantless nonconsensual blood draws. For example, all 50 states have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense. [Citation omitted.] Such laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution." 569 U.S. at 160-61.

In *Birchfield v. North Dakota*, 579 U.S. ___, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016), the United States Supreme Court held that the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving, but not warrantless blood tests. 136 S. Ct. at 2184-85. Importantly for Arellano's case, it also confirmed that *McNeely* and *Neville* "referred approvingly to the general concept of implied consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." 136 S. Ct. at 2185.

"Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. See, e.g.*, McNeely* [citation omitted]; *Neville* [citation omitted]. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them." 136 S. Ct. at 2185.

We note that our Supreme Court granted motions for rehearings in both *Ryce I* and *Nece I* in light of the *Birchfield* decision. The court essentially reaffirmed its holding in each case. *Ryce II*, 306 Kan. at 699-700; *Nece II*, 306 Kan. at 681. The court did, though,

15

"modify *Ryce I* to reflect the validity of conducting a *breath* test in a DUI case where an arrest is made under the warrant exception of a search incident to lawful arrest." *Ryce II*, 306 Kan. at 693. It upheld the holding that K.S.A. 2016 Supp. 8-1025 is facially unconstitutional.

With cases from the United States Supreme Court and our Supreme Court guiding this court's decision, Arellano's contention that evidence of his refusal should not be admissible as evidence against him in his DUI case is unconvincing. Nevertheless, Arellano asks this court to "revisit this issue by moving to the next logical step." He argues that a defendant's refusal to take a test should be protected and inadmissible at trial.

Nevertheless, this court is bound to follow our Supreme Court precedent absent some indication that our Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Further, "[t]he United States Supreme Court's interpretation of the United States Constitution is controlling upon and must be followed by state courts." *State v. Lawson*, 296 Kan. 1084, Syl. ¶ 1, 297 P.3d 1164 (2013). Arellano has not demonstrated that controlling law has overruled any of the previous holdings, nor does he argue that we have any indication that our Supreme Court is departing from prior holdings. Because this court is bound by previous decisions and the law is settled in this area, Arellano's request that this court hold otherwise is rejected.

### *The good-faith exception*

The State contends that if this court determines that Arellano's Fourth Amendment rights were infringed upon, the good-faith exception to the exclusionary rule applies. The exclusionary rule is a judicially created remedy that exists to prevent the use of unconstitutionally obtained evidence in a criminal proceeding against the subject of the

illegal search. The rule applies when it would act as a deterrent. *State v. Pettay*, 299 Kan. 763, 769, 326 P.3d 1039 (2014).

The United States Supreme Court established the good-faith exception to the exclusionary rule in *United States v. Leon*, 468 U.S. 897, 920-22, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). The *Leon* good-faith exception applies when an affidavit does not supply a substantial basis for the determination of probable cause but does provide some indicia of probable cause sufficient to render official reliance reasonable. *State v. Daniel*, 291 Kan. 490, 498-500, 242 P.3d 1186 (2010), *cert. denied* 131 S. Ct. 2114 (2011); see also *Davis v. United States*, 564 U.S. 229, 238-39, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). In *Illinois v. Krull*, 480 U.S. 340, 349-50, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987), the United Sates Supreme Court extended the good-faith exception to the exclusionary rule to situations when a law enforcement officer reasonably and in good faith relies on a statute later found to be unconstitutional.

Our Supreme Court adopted the exception to the exclusionary rule from *Krull* in *Daniel*, 291 Kan. at 496. The *Daniel* court specified that the exception is limited to situations in which the officer's reliance on the statute be objectively reasonable. 291 Kan. at 500. Whether an officer's reliance on a statute was objectively reasonable depends on whether the officer should have known the statute was unconstitutional and whether the Legislature "wholly abandoned its responsibility to enact constitutional laws" when it passed the statute in question. 291 Kan. at 500.

In *State v. Kraemer*, 52 Kan. App. 2d 686, 371 P.3d 954 (2016), *rev. denied* 306 Kan. 954 (2017), the defendant was arrested for DUI and a breath test was obtained under the same statutory scheme as the one in this case. In applying the good-faith exception, this court noted:

17

"We find nothing here to suggest either that the Kansas Legislature wholly abandoned its responsibility to enact constitutional laws or that the statute was so clearly unconstitutional at the time of Kraemer's arrest that a reasonably well-trained officer would have known that it was unconstitutional; thus, Officer Constantino would not have known the written and oral implied consent advisory informing Kraemer that he might be charged with a separate criminal offense for refusal of requested testing was coercive. As such, suppressing the evidence in this case would do nothing to deter police from violating a defendant's Fourth Amendment rights because the officer acted in good faith in following the statute in effect at the time. [Citation omitted.] The district court correctly applied the good-faith exception to the exclusionary rule." 52 Kan. App. 2d at 699.

There are similarities between these cases and Arellano's case. Officer Barnes provided the same implied consent warnings as in *Kraemer*, and because *Ryce I* and *Nece I* were decided later, Barnes acted in good faith while informing Arellano of the laws at that time. Nevertheless, this case is premised around that fact that law enforcement obtained consent to the breath test after providing the implied consent warning that was later determined to be inaccurate and unconstitutional. Although Arellano was provided the same implied consent warning as Kraemer, Arellano did not rely on that warning when consenting to a breath test. Instead, Arellano still withdrew his consent. Therefore, there was no breath test performed and no breath test results to suppress. As a result, Arellano's argument fails.

*Harmless error*

Assuming for argument sake that the trial court erred in denying Arellano's motion to suppress evidence, the State argues harmless error. The erroneous admission of evidence is subject to review for harmless error under K.S.A. 2016 Supp. 60-261 and K.S.A. 60-2105. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013).

18

When an appellate court reviews a constitutional challenge to the admission of evidence, it applies the federal constitutional rule under which an error is not harmless unless the appellate court is willing to declare beyond a reasonable doubt the error will not or did not affect substantial rights and the result of the trial. The party benefitting from the error must persuade the court there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. Santos-Vega*, 299 Kan. 11, 23-24, 321 P.3d 1 (2014).

Without evidence of his refusal, there was still plenty of evidence against Arellano. When Barnes pulled him over, he did not pull over all the way to the side of the road; instead, he stopped his vehicle a couple of feet away from the curb. Barnes observed that Arellano's eyes were bloodshot, watery, and glazed over, and he had to lean against the police vehicle for stability. Arellano fumbled with his wallet and smelled of alcohol. Arellano failed two field sobriety tests, presenting six of eight impairment indicators on the first test and three of four impairment indicators on the second. He made verbal statements to Barnes throughout the night—he told Barnes that he had "been out" and "had a couple," and at the police station later he told Barnes, "I'll be over, I'm not going to lie to you."

Arellano uses *City of Overland Park v. Lull*, 51 Kan. App. 2d 588, 349 P.3d 1278 (2015), to bolster his argument, but the two cases are not analogous. In *Lull*, the district court denied the defendant's motion to suppress refusal evidence after the officer failed to give proper notice of Kansas' implied consent law when he omitted a paragraph explaining the consequences for a repeat DUI offender. The paragraph applied to the defendant, as he informed the officer that it was his second DUI. The *Lull* court held that because the defendant did not receive the information necessary for him to make a fully informed decision, the evidence was not voluntarily obtained and, therefore, inadmissible, and the error by the district court was not harmless. 51 Kan. App. 2d at 594-95.

Nevertheless, although the court in *Lull* determined that the admission of refusal evidence was not harmless, this case is distinguishable from *Lull*. Arellano claims that this case also "involved an improper and confusing notice" as well. This is not the case. Barnes complied with the implied consent law provisions, reading the then-accurate statements in full multiple times. Arellano was not in a position like the defendant in *Lull* in which he was not fully informed of the penalties and consequences outlined in the implied consent statute. Therefore, Arellano's argument that *Lull* supports his position is unconvincing.

Instead, the evidence shows that even if there was error, there is no real probability that it affected the outcome of the trial.

Affirmed.